IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DAVID SALZMAN and SONIA SALZMAN, <br><br> Plaintiffs, <br><br> vs. <br><br> J. THOMAS BOWEN as conservator for TERRY HENDERSON and SHAUNNA HOOD, <br><br> Defendants. | ORDER and MEMORANDUM DECISION <br><br><br> Case No. 2:07-CV-854 CW |

In this case, Plaintiffs David and Sonia Salzman have brought an action against Defendants Terry Henderson (through J. Thomas Bowen in his capacity as Mr. Henderson's conservator) and Shaunna Hood related to the sale of real property. The Salzmans have brought a claim of fraud against Ms. Hood, and claims of fraud and breach of contract against Mr. Henderson. Now before the court are the motions for summary judgment by Mr. Henderson and Ms. Hood on the fraud claims against them.[1] As discussed below, these motions are GRANTED.

**BACKGROUND**

This case centers on a 14,000 square foot home situated on 100 acres in Wasatch County, Utah known by the parties as "the Boulders." In December 2004, the Salzmans purchased the Boulders for $4.6 million from Ms. Hood, who held the title. Ms. Hood has never lived at the

---

[1] Mr. Henderson also moved for partial summary judgment on the contract claim against him. The court anticipates that it will issue an opinion on that motion early next week.

Boulders. Rather, in the years proceeding the sale, the property was owned and occupied by Ms. Hood's sister, Candace Garvey, and her husband, Steve Garvey. Mr. and Mrs. Garvey purchased the property from Mr. Henderson several years prior to its sale to the Salzmans. Mr. Henderson is Ms. Hood and Ms. Garvey's father. Ms. Hood allegedly held title to the Boulders to help resolve a dispute between Mr. Henderson and the Garveys over the Boulders.

As part of the sale to the Salzmans, Ms. Hood delivered to them a disclosure stating that because she did not reside at the Boulders, she did not have sufficient knowledge to represent its condition. The sale was negotiated extensively and prior to closing the Salzmans contracted for and received a detailed inspection report from a third party describing the condition of the property. Also in connection with the sale of the Boulders to the Salzmans, Mr. Henderson signed a written contract with the Salzmans agreeing to pay for "material failures or structural defects" relating to various aspects of the property for a period of three years. Following the closing, Mr. Henderson paid more than $65,000 to the Salzmans for repairs to the property.

Since taking possession of the Boulders, the Salzmans have substantially altered the home at the Boulders, removing and replacing the exterior rock veneer, replacing the decks and making other changes. These alterations have dramatically changed the appearance of the home. The Salzmans assert that a large portion of this work was required because of defects and failures that should have been disclosed to them prior to closing.

In addition to the stone veneer and decks, the Salzmans assert that there were a host of other defects at the Boulders that should have been disclosed to them before closing. One notable problem that the Salzmans discovered was that various animals had found their way

under the floorboards and died, creating a terrible stench.[2] The other problems cover a wide swath, from faulty shower doors to rotting decks and dead trees. These issues and their implications in this case will be discussed in more detail as necessary below.

The Salzmans filed this action in November 2007. In support of their fraud claim against both Mr. Henderson and Ms. Hood, the Salzmans allege both fraudulent misrepresentations and fraudulent non-disclosures.[3] The alleged non-disclosures are numerous and varied, and are plead against both Mr. Henderson and Ms. Hood. As a fraud claim against Mr. Henderson, the Salzmans contend that Mr. Henderson knew that the seller's real estate agent told them that a caretaker had been continuously employed at the Boulders for several years before the purchase and asserted that the Boulders had been well maintained. The Salzmans contend that this statement was a misrepresentation because Mr. Henderson had at one point actually paid the caretaker not to take care of the Boulders for about nine months in an effort to get leverage against the Garveys in his dispute with them. As a fraud claim against Ms. Hood, the Salzmans claim that Ms. Hood signed a form giving notice that she had insufficient knowledge about the Boulders to represent its condition. They contend that this notice was false because Ms. Hood had earlier signed a detailed disclosure form about the condition of the Boulders. Mr. Henderson and Ms. Hood both seek summary judgment in their favor on the fraud claims against them.

---

[2] Mr. and Mrs. Garvey's attempts to prevent such pest infestations at the Boulders when they lived there probably killed Puff Daddy. Not the rapper/actor/clothes designer/etc., but the Garveys' pet dog named in his honor.

[3] The Salzmans do not allege affirmative misrepresentations in their complaint, but the court will address these allegations because the Salzmans arguably extended their fraud claims to cover them in the discovery process.

3

# ANALYSIS

I. **Summary Judgment Standard**

"Summary judgment is appropriate if the moving party demonstrates that 'there is no genuine issue as to any material fact' and that it is 'entitled to judgment as a matter of law.'" *United States ex rel. Bublaw v. Orenduff*, 548 F.3d 931, 946 (10th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). Summary judgment must be entered "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id.* (citation omitted).

In the Tenth Circuit, "the moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (quotations, citations, and alteration omitted). "Even when, as here, the moving party does not have the ultimate burden of persuasion at trial, it has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (citation omitted). A moving party may meet this burden "by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Id.* (citation omitted).

When deciding if a nonmovant has proffered evidence sufficient to carry its burden at trial, the court must not weigh the evidence or determine credibility. Instead, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in the [nonmovant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Although a

court views the evidence in a light most favorable to the nonmovant, it nevertheless does so "through the prism of the substantive evidentiary burden." *Id.* at 254.

## II. Fraud Claims

The burden of proof to prove a claim of fraud under Utah law is clear and convincing evidence. *See, e.g.*, *Daines v. Vincent*, 190 P.3d 1269, 1279 (Utah 2008). To avoid summary judgment on these claims, therefore, the Salzmans must show that they have sufficient evidence to carry that burden at trial. The question thus becomes "whether the evidence presented is such that a jury applying" the clear and convincing evidence "standard could reasonably find for either the plaintiff or the defendant." *Anderson*, 477 U.S. at 255. If a reasonable jury could not return a verdict of fraud based on the evidence the Salzmans have presented, then summary judgment is appropriate. *Id.* at 252. As discussed further below, the court concludes that the Salzmans have not adduced sufficient evidence to establish their fraud claim against Ms. Hood. Their fraud claim against Mr. Henderson also fails, but for a different reason, as discussed immediately below.

### A. Mr. Henderson

In short, the Salzmans' fraud claim against Mr. Henderson fails because Mr. Henderson did not sell the Boulders to them. It is undisputed that Ms. Hood, not Mr. Henderson, held title to the Boulders at the time of the sale. Thus, Ms. Hood sold the Boulders to the Salzmans. As discussed further below, the court accordingly concludes that Mr. Henderson had no duty to the Salzmans to reveal latent defects, negating the fraud claims against him related to his alleged omissions. Moreover, as further explained, any representations the real estate agent made in an effort to induce the Salzmans to purchase were not legally chargeable Mr. Henderson, barring the

5

misrepresentation claim against him. The Salzmans have failed to proffer evidence that supports a claim that the agent was acting as Mr. Henderson's agent rather than as the agent for the legal seller and holder of the title, Ms. Hood.

### 1. Fraudulent Non-Disclosures

The first step in the analysis is to determine what duty, if any, Mr. Henderson owed to the Salzmans in connection with the sale of the Boulders. Mr. Henderson points out that "[i]t is axiomatic that one may not be liable to another in tort absent a duty." *Loveland v. Orem City Corp.*, 746 P.2d 763, 765 (Utah 1987). The Salzmans do not contest this requirement, but argue that in Utah, a seller of real property has a duty to reveal latent defects of which the seller knows. *See*, *e.g.*, *Mitchell v. Christensen*, 31, P.3d 572 (Utah 2001). The Salzmans fail to acknowledge, however, that Mr. Henderson was not the seller of the Boulders - - his name was not on the title at the time of sale, nor is there evidence that his name appears anywhere on any of the relevant documents involved in the sale  The Salzmans instead assert that because Mr. Henderson was the "beneficial owner" of the Boulders at the time of sale, he should be considered a seller for purposes of their fraud claim. No Utah case cited by the parties, however, has extended a fraud claim for non-disclosure to "beneficial owners."

Nor do the Salzmans persuasively argue that the Utah Supreme Court would expand the duty in that way. The lone Utah case the Salzmans cite in support of concluding that Mr. Henderson has a duty to disclose is *Smith v. Frandsen*, 94 P.3d 919 (Utah 2004). In *Smith*, the Utah Supreme Court reiterated that under Utah state law, a developer has a duty to reveal known latent defects to vendees and subsequent vendees. *See id.* at 924. The *Smith* court, however, explained that this duty "does not continue indefinitely." *Id.* Rather, unless there was intentional

fraud, the duty continues only until "the vendee, or his successor, have had adequate time and opportunity. . . to discover the existence of the condition." *Id.* (quoting Restatement (Second) of Torts § 353 cmt. g (1965)).[4] In *Smith*, the court applied this limitation to hold that when a developer transfers title in a property to a general contractor, the developer has no duty to any buyer further down the chain of title. 94 P.3d at 925-26.

The Salzmans do not argue that Mr. Henderson has a duty directly under *Smith*. Instead, they contend that *Smith* indicates the Utah Supreme Court's willingness to impose disclosure duties upon non-owners. This contention is not a fair reading of *Smith*. Rather, in *Smith*, the Utah Supreme Court actively limited the developer exception it carved out in previous cases.

The Salzmans also argue that a jury could deem Mr. Henderson the "seller" here because he held an equitable interest in the Boulders. While it is true that Utah recognizes equitable interests in real estate, the Salzmans have not presented evidence from which a fact finder could find that Mr. Henderson had a legally enforceable equitable interest in the property. Although the Salzmans assert that Ms. Hood held title to the Boulders for the benefit of her father, Mr. Henderson, and that the proceeds of the sale were actually delivered to him, they give no evidence that Mr. Henderson held a legally enforceable interest in the property. To impose legal duties of disclosure on a party without an enforceable equitable or legal interest in real property would create untenable uncertainty about who has an obligation to disclose. For example, under

---

[4] The Salzmans also cite a nearly 30-year old case from the Colorado Court of Appeals, *Schnell v. Gustafson*, 638 P.2d 850 (Co. Ct. App. 1981) for its holding that no privity of contract is necessary for a duty of disclosure to arise in a fraud case involving property. *Schnell*, however, arose in factual circumstances distinguishable from those here, and involved a different disclosure standard than the one involved here. Accordingly, the court is not persuaded that the Utah Supreme Court would adopt *Schnell*.

7

the Salzmans' view of how the law should be extended, it would be unclear if a third party to the transaction, perhaps even a close relation of the seller who has been afforded longstanding use of the property, could be charged with an obligation to disclose defects known to him even though he had no legally enforceable right to use the property. To avoid such ambiguities, the court believes that the Utah Supreme Court would draw the line at persons who have enforceable legal or equitable rights. That court's line drawing exercise in *Smith* reinforces this conclusion.

Accordingly, because the Salzmans have not adduced evidence suggesting that Mr. Henderson held enforceable legal or equitable rights in the Boulders, he was not a 'seller" within the meaning of the *Mitchell* line of cases. Indeed, if Mr. Henderson had held such rights, or the Salzmans reasonably believed that he held such rights, this would have required Mr. Henderson to have quit claimed all such interest to them. There is no evidence that Mr. Henderson conveyed to the Salzmans any interest he is now alleged to have held or that the Salzmans made any demand that he do so. Because Mr. Henderson was not a seller, he had no duty to disclose known latent defects to the Salzmans. The court, therefore, does not have to determine whether Mr. Henderson was aware of any latent defects in this case.

## 2. Affirmative Misrepresentation

The Salzman's fraud claim for affirmative misrepresentation against Mr. Henderson fails on similar grounds. In support of this claim , the Salzmans claim that Ann MacQuiod, a real estate agent for the seller of the Boulders, told them that Gregory Young had been continuously employed as the Boulders' maintenance man, making the property "well maintained."[5] The

---

[5] If the alleged misrepresentation had been only that the property was "well maintained," the Defendants would be correct that such a statement would be mere puffing in the context of

Salzmans, however, presented evidence that Mr. Young was not continuously employed as the caretaker, as Mr. Henderson actually paid Mr. Young not to maintain the Boulders for a nine month period. If Ms. MacQuiod's statement can be attributed to Mr. Henderson, therefore, it could be the basis of a misrepresentation claim against him, even if he was not the owner of the Boulders.

The Salzmans have not shown enough evidence to support the legal conclusion that Ms. MacQuiod was Mr. Henderson's agent for the purpose of making representations about the Boulders. Most importantly, the contract authorizing Ms. MacQuiod to try to sell the property was between Ms. MacQuiod and Ms. Hood, the title holder. There is evidence that Mr. Henderson discussed the sale of the Boulders with Ms. MacQuiod, including that she act as the seller's real estate agent and possible improvements to the property to increase its attractiveness. This evidence, however, is insufficient to conclude that Mr. Henderson authorized Ms. MacQuiod to make representations to the Salzmans on his behalf about Mr. Young, the condition of the property, or any other item related to the sale of the property. Accordingly, Mr. Henderson cannot be liable for Ms. MacQuiod's representations concerning the maintenance of the Boulders.[6]

For all of these reasons, Mr. Henderson's motion for summary judgment in his favor on the fraud claim against him is GRANTED.

---

this case. *See*, *e.g.*, *Boud v. SDNCO, Inc.*, 54 P.3d 1131, 1135-36 (Utah 2002) (subjective opinions such as that product is the "best" are not actionable in fraud).

[6] Counsel for the Salzmans conceded at the hearing that they do not claim that Ms. MacQuiod's alleged misstatement may be attributed to Ms. Hood. This concession is correct, because there is no evidence on the record that Ms. Hood knew or could be imputed to have known that Mr. Young was not continuously employed as the Boulders' maintenance man.

### B. Ms. Hood

Unlike in their claim against Mr. Henderson, the Salzmans have established that Ms. Hood, as the seller of the Boulders, did owe them the legal duty to disclose latent defects known to her. The Salzman's fraud claims related to omissions against Ms. Hood thus do not fail for lack of duty, but rather for failure to offer evidence that Ms. Hood knew of the defects about which the Salzmans complain. The Salzmans' fraud claim against Ms. Hood for affirmative misrepresentation also fails for lack of evidence.

#### 1. Fraudulent Non-Disclosures

The Salzmans have identified 16 defects at the Boulders that they contend Ms. Hood had a duty to reveal but did not.[7] With the possible exception of the deck, which is discussed later, however, the Salzmans do not offer any specific evidence from which a reasonable jury, applying a clear and convincing standard, could conclude that Ms. Hood knew of any of these defects.

In support of the proposition that Ms. Hood knew of the alleged defects, the Salzmans make two arguments. First, they argue that it could be inferred that Ms. Garvey told Ms. Hood about the problems. In support, they point out that Ms. Hood spoke almost daily with Ms. Garvey, that Ms. Garvey knew of a multitude of problems with the Boulders, and that Ms. Garvey discussed problems with Ms. Hood. While this chain of facts might lead to a reasonable inference that Ms. Garvey talked with Ms. Hood about at least some defects with the Boulders, the Salzmans do not point to any specific defect that the sisters discussed. Counsel for the Salzmans deposed Ms. Garvey on this topic, the exchange was extremely broad in nature.

---

[7] The Salzmans list 22 defects in their complaint, but a later affidavit by Mr. Salzman limits the claimed defects to 16.

Counsel asked Ms. Garvey if she "discuss[ed] those matters with your sister," and Ms. Garvey responded "Yeah, probably. Yeah, I talked to her every day. I'm sure I did." (Pl.'s Memo. in Opp'n at 166, citing Ms. Garvey's deposition.)

Such a vague question and answer do not clearly establish what problems the sisters discussed, when they discussed them, the context in which they discussed them, whether they discussed attempts to fix problems, and so on. This type of evidence does not rise to the type of clear and convincing evidence the Salzmans would need to convince a reasonable jury of Ms. Hood's knowledge of any of the alleged defects.[8]

In any event, the Salzmans would have difficulty establishing that many of the problems they identified were even present and thus subject to knowledge by Ms. Hood at the time of sale. The Salzmans conceded at oral argument that many of the problems were intermittent in nature so their inspector may not have noticed them. These included the problems with the electrical system, the driveway gates and the media room. Further, problems with the watering system causing the death of the more than 100 trees appears on its face to be a problem the Salzmans allege happened after the sale. If these defects were not apparent at the time of sale, the Salzmans give no compelling reason why Ms. Hood would have been aware of them as of the closing date.

---

[8] Similarly, at oral argument, counsel for the Salzmans pointed out that Ms. Hood was involved in hiring contractors to prepare the Boulders for sale, arguably allowing an inference that Ms. Hood knew generally about problems with the property. But again, the Salzmans do not point to any specific problems that Ms. Hood tasked the workers with addressing or any defects of which the workers informed Ms. Hood, if any.

It is also important to observe that the Salzmans have identified many of the defects in vague terms. For example, the Salzmans state that the electrical system and media room did not function properly. These general characterizations fail to give Ms. Hood or the court enough information to identify the exact defects that Ms. Hood allegedly failed to disclose. This problem was apparent at the hearing on these motions. For example, one of the defects identified by the Salzmans is that the plumbing system failed to function properly. Initially, the Salzmans' counsel explained this item to the court as a problem with the diameter of the pipes entering the home. But after the Defendants pointed out that the Salzmans' own inspector had alerted them to the diameter of the pipes and the water pressure at the entrance of the home, the Salzmans' counsel then asserted that the pipe problem was one of insufficient water pressure in the showers when more than one faucet was running. These types of moving target descriptions of problems are what the heightened pleading of fraud is meant to nip in the bud long before trial.

Moreover, the Salzmans must also submit evidence to allow a reasonable jury to find that each of the alleged defects were latent. Under the *Mitchell* line of cases, Ms. Hood was under a duty to disclose defects, if known to her, that could not reasonably be discovered by the buyer. In Utah, a defect must only be revealed if it is not "apparent to ordinary prudent persons," and "under certain circumstances, a reasonably prudent buyer should be put on notice that a possible defect exists, necessitating either further inquiry of the owner of the home. . . or inspection" by an expert. *Mitchell*, 31 P.3d at 575. In some cases, the vagueness of the Salzmans' descriptions of the non-disclosed items prevents such an analysis and in other cases the evidence precludes a finding of latency. For example, the alleged defects in the piping or with the water pressure were both discoverable on a reasonable inspection and indeed the inspection report identifies the

problem about which the Salzmans now complain. Other defects the Salzmans identified, even giving a broad reading to the description, appear to fail this standard on its face. These are the problems with the pool house, the problem with the shower doors, at least some of the problems with the master shower, and the problems with the media room. None of these items strike the court as ones that a prudent person would not discover upon a reasonable inspection. Finally, the Salzmans' inspector gave sufficient information on many items sufficient to put the Salzmans on notice that they needed a further inspection.

The rotting deck is the only defect for which the Salzmans cite clear and specific evidence that could suggest that Ms. Hood may have had knowledge. Specifically, in connection with an earlier effort to auction the Boulders, Ms. Hood signed a disclosure form about the condition of the property. In that form, it was indicated by two check marks first that there were "past or present problems with driveways, walkways, patios, decks, or retaining walls on the Property," and second that there were no attempts to repair those problems. (Pl.'s Memo. in Opp'n. at 172, citing an exhibit.) But the Salzmans have no independent evidence that Ms. Hood intended to indicate an unfixed problem with rotting decks when she made or approved of these check marks.[9] And the check marks alone are not enough. The check mark indicating an issue with driveways, walkways, patios, decks or retaining walls does not allow a reasonable inference about which of those items had experienced problems. The problems could have existed with

---

[9] The Salzmans produced a sworn statement by a painter who said that he painted over rot on the deck before the Boulders was sold to the Salzmans, and that his doing so partially covered the rot. Importantly, the painter gave a later deposition in which he stated that he had not painted over wood rot and that no one had ever directed him to do so. Even taking what the painter said in his earlier statement as true, however, this statement alone does not show that Ms. Hood ever knew about wood rot on the decks, or that she directed the painter to cover it up.

any of the listed items other than the decks. Moreover, the form calls for a check mark if there were "past or present" problems. The past problems may or may not have been material at the time of sale to the Salzmans. Further, Ms. Hood would have been required to disclose those problems to the Salzmans only if they were latent, meaning that they were not observable to the Salzmans or their inspector upon a reasonable inspection of the property.

In response to these problems with the form as evidence, the Salzmans argue that they are entitled to all inferences in their favor. But given these various ambiguities presented by the form, the court finds it unreasonable to infer from the form alone that Ms. Hood knew about wood rot on the decks. *See, e.g.*, *Angel v. Goodman Mfg. Co., L.P.*, 330 Fed. Appx. 750, 755 (10th Cir. 2009) ("While a court is required to construe summary judgment evidence in the light most favorable to the non-movant, the construction and resulting inferences must be reasonable and allow for a verdict in the non-moving party's favor.") (citations omitted).

Put another way, under a burden of proof requiring clear and convincing evidence, a jury could not find from this evidence that Ms. Hood had knowledge of a latent defect in the deck that she failed to disclose. Instead, as Ms. Hood argues, these check marks are only a scintilla of evidence on the issue. Such evidence cannot prevail at summary judgment. *See, e.g.*, *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995).

### 2. Affirmative Misrepresentation

The Salzmans allege one affirmative misrepresentation against Ms. Hood. Specifically, they contend that Ms. Hood made a misrepresentation when she provided them a "Non-Occupant of Property Addendum" in which she declined to provide a description of the Boulders' condition because "Seller has insufficient current personal knowledge regarding the physical

condition of the Property." The Salzmans claim that this addendum was false because several months earlier, Ms. Hood signed the detailed disclosure form described above. The Salzmans contend that this form could have indicated that Ms. Hood knew about an unaddressed problem with the decks.

This claim fails. As the court has already explained, a reasonable jury could not use Ms. Hood's earlier disclosure form alone as clear and convincing evidence that she knew that there was a problem with the decks. Moreover, the lapse of several months between the disclosure form and the addendum is also fatal to the Salzmans' argument. The addendum disclaims "current personal knowledge" of the property. Having signed a disclosure form several months earlier does not alone suggest that Ms. Hood's disclaimer of current knowledge is false.

## ORDER

For the reasons stated above, the court ORDERS as follows;

Ms. Hood's motion for reconsideration (Doc. No. 82) is DENIED as moot, because Ms. Hood is no longer a party to this suit;

Ms. Hood's motion for summary judgment (Doc. No. 86) is GRANTED in her favor;

Mr. Henderson's motion for partial summary judgment on the Salzmans' fraud claim (Doc. No. 91) is GRANTED in his favor; and

Ms. Hood's motion to strike (Doc. 120) is DENIED as moot.

SO ORDERED this 8th day of January, 2010.

BY THE COURT:

Clark Waddoups
United States District Judge